# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

BENTON DWIGHT and
HELEN MIESCH,

                   Plaintiffs,

v.                                                    No. CIV 15-907 JAP/SCY

CITY OF ALBUQUERQUE,
Albuquerque Police Officer TERRY DYE,
Albuquerque Police Officer JOSE BRIONEZ, and
Albuquerque Police Officer ANTHONY FINCHER,

                   Defendants.

## MEMORANDUM OPINION AND ORDER

Individual Defendant Albuquerque police officers Terry Dye, Jose Brionez, and Anthony Fincher seek summary judgment on Plaintiffs' federal law claims against them based on the defense of qualified immunity. DEFENDANTS DYE, BRIONEZ AND FINCHER'S MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY (Defendants' Motion) (Doc. No. 37). Plaintiffs Benton Dwight and Helen Miesch argue, in part, that the individual Defendants have not established they are entitled to qualified immunity. PLAINTIFFS' RESPONSE TO DEFENDANTS DYE, BRIONEZ, AND FINCHER'S MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY (Plaintiffs' Response) (Doc. No. 44). Plaintiffs incorporate their MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS VI, VII, VIII, IX, AND XI (Plaintiffs' Motion) (Doc. No. 42) as part of Plaintiffs' Response to some of the federal law claims. In DEFENDANTS DYE, BRIONEZ, AND FINCHER'S REPLY TO PLAINTIFFS' RESPONSE TO THEIR MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY

(Defendants' Reply) (Doc. No. 48), the individual Defendants contend that Plaintiffs have glossed over key undisputed facts and have misapprehended the pertinent law.

The Court has considered Defendants' Motion, the related briefs (Doc. Nos. 37, 44, 48) and exhibits,[1] including the Defendant officers' video recordings from their lapel cameras, and has also reviewed Plaintiffs' Motion, along with the related briefs (Doc. Nos. 42, 47, 51) and exhibits. In addition, the Court has reviewed argument by counsel at a motion hearing[2] held August 23, 2016. 8/23/16 Minutes (Doc. No. 56). After careful consideration of the pertinent law and the briefing, the Court will grant in part and deny in part both parties' motions.

## Background

Plaintiffs' COMPLAINT TO RECOVER DAMAGES FOR TORTS (Complaint) (Doc. No. 1–1) against Defendants arises from a June 28, 2014 encounter between Plaintiffs and the individual Defendant police officers at Plaintiffs' apartment. Officers were responding to a telephone call from Plaintiff Dwight concerning a possible domestic disturbance. Plaintiffs filed the Complaint in State District Court, and Defendants removed the case to Federal District Court based on federal question jurisdiction. Notice of Removal (Doc. No. 1).

Plaintiffs initially asserted five state law claims (Counts I–V)[3] and nine federal law claims (Counts VI–XIV) against Defendants. In their Response to Defendants' Motion for Summary Judgment, Plaintiffs withdrew three of the federal law claims (Counts X, XII, and XIII). At the August 23, 2016 motion hearing, Plaintiffs' counsel withdrew Count VIII

---

[1]The attachments to the motions include affidavits by Officers Dye and Brionez and their recorded interview statements along with some responses to written discovery. However, discovery was stayed in this case in relation to Defendants' request for qualified immunity. Thus, only limited discovery is available and it does not include any affidavits or deposition testimony by Plaintiffs.
[2]At the motion hearing, the Court played some of the lapel camera videos and allowed counsel to explain how various portions of the videos supported their arguments.
[3]The parties' motions do not address the state law claims. In addition, Plaintiffs do not seek summary judgment on any claims against Defendant City of Albuquerque. Plaintiffs' federal law claims are brought solely against the individual police officers and not the City.

("Unreasonable Seizure for Unlawful Orders to Plaintiff Dwight"), explaining that the allegations in Count VIII merged to form the same claim set out in Count IX ("Unreasonable Search and Seizure for Grabbing and Searching Plaintiff Dwight"). 8/23/16 Minutes. In addition, Plaintiffs' counsel agreed to withdraw the First Amendment retaliation claim (Count XIV). *Id.*

Plaintiffs' four remaining Fourth Amendment claims are: 1) "Unreasonable Seizure for Ordering Plaintiff Dwight to Answer the Door" against Defendant Dye (Count VI); 2) "Unreasonable Search Seizure for Entering Plaintiff Miesch's Home and Grabbing Her" against Defendant Dye (Count VII); 3) "Unreasonable Search and Seizure for Grabbing and Searching Plaintiff Dwight" against Defendants Dye and Brionez (Count IX); and 4) "Unlawful Arrest" against Defendant Dye (Count XI). Complaint at 6 –13. [4]

The individual Defendants seek dismissal of the four remaining federal claims based on the defense of qualified immunity. Plaintiffs ask for summary judgment on each of the four remaining federal claims.

---

[4]Based on Plaintiffs' counsel's representations at the 8/23/16 motion hearing, a number of the claims were clarified, narrowed, or withdrawn. Initially, Plaintiffs alleged that even though Officer Brionez did not grab Ms. Miesch's shirt (Count VII), Officer Brionez had a legal duty to intervene and stop Officer Dye from violating Plaintiffs' constitutional rights. Complaint ¶ 112. When asked at the hearing to identify in the video recordings when Officer Brionez should have intervened to stop Officer Dye, Plaintiffs' counsel agreed that would be a problem and withdrew Count VII against Officer Brionez. With respect to allegations that both officers unlawfully seized Mr. Dwight by requiring him to answer the door (Count VI), the undisputed evidence is that Officer Dye, not Officer Brionez, issued the order to "open up." Regarding the unlawful arrest claim (Count XI), the undisputed evidence is that Officer Dye was responsible for the decision to arrest Mr. Dwight, not Officer Brionez or Sgt. Fincher. Therefore, only the unlawful pat down claim (Count IX) proceeds against both Officers Dye and Brionez. The other federal law claims proceed against Officer Dye. 8/23/16 Minutes.

## Undisputed Material Facts[5]

### Call to Police Dispatch

On June 28, 2014, at around 12:30 p.m., Mr. Dwight called the Albuquerque Police Department's (APD's) non-emergency telephone number and "alerted dispatch that he may need assistance in dealing" with a dispute he was having with his girlfriend/fiancé Helen Miesch. The police were dispatched to Mr. Dwight's address at 5800 Eubank N.E., Building A,[6] Apartment 821 in Albuquerque. The police identified or "coded" Mr. Dwight's telephone call as a domestic dispute/incident. Officers Dye and Brionez each have over 25 years of police experience. Upon being dispatched, the officers knew that APD had received the call from a man reporting a possible domestic disturbance between a man and a woman, that the woman's name was Helen, and that assistance had been requested. The officers also knew before reaching their destination that the call had been disconnected by a woman and that police dispatch had called back the telephone number three times with no answer.

### Knocking at Apartment 821

Officer Dye and Officer Brionez climbed some stairs to the second floor of the pertinent apartment building, and Officer Dye knocked on the door of Apt. 821 without announcing himself or saying anything. There was no response. After about 30 seconds, Officer Dye knocked on the door again and a barking dog is heard. Dye Video Cam (Ex. E–1) (Doc. No. 39). Officer Dye said to Officer Brionez that he thought someone was muffling the dog inside and

---

[5] In arriving at the Undisputed Material Facts, the Court reviewed the lapel camera videos and the attachments to the briefing.
[6] The officers realized upon their arrival at 5800 Eubank N.E., that the apartment buildings were not identified by letter, e.g., Apt. A, but, instead, were identified by number. While the officers were dispatched to Apt. 821 in Building A, they learned from the apartment manager that there was an Apt. 821 in Building 8. Thus, the officers went to Apt. 821 in Building 8, which turned out to be the caller's apartment, although the officers were not certain until later in the encounter that they had responded to the correct apartment building.

that the television might be on. About a minute later, Officer Dye knocked a third time, stating "Albuquerque Police, open up." No one responded.

Officer Brionez then knocked on a neighbor's door across the balcony from Apt. 821. The neighbor answered and told the officers that she had not heard anything coming from Mr. Dwight's apartment and had not seen anyone from the apartment that day. She believed that two people, a man and a woman who she thought were boyfriend and girlfriend, lived in Apt. 821.

About 3½ minutes after Officer Dye first knocked at Apt. 821, he knocked for the fourth time at Plaintiffs' door. Mr. Dwight opened the door this time and quickly[7] came out of the apartment onto the balcony with the police officers, closing the apartment door behind him. Mr. Dwight faced the officers with his back against the balcony railing.

**<u>Officers' Interaction with Mr. Dwight</u>**

Officer Dye asked Mr. Dwight if he was the only one home, and Mr. Dwight responded "Yes." Mr. Dwight's response turned out to be untrue, as Ms. Miesch was at home, i.e., inside the apartment. Officer Dye asked Mr. Dwight if he had called 9-1-1, and Mr. Dwight said "No." While Mr. Dwight had not called 9-1-1, he had called the non-emergency police number to request police assistance, which he did not explain to Officer Dye.

Officer Dye informed Mr. Dwight that the police had received a call about a domestic dispute. He asked Mr. Dwight if his girlfriend was home, and Mr. Dwight said "No."[8] Officer Dye asked Mr. Dwight where his girlfriend was, and Mr. Dwight's response is unclear. He may

---

[7] Plaintiffs dispute Defendants' characterization of Mr. Dwight having exited his apartment "quickly." Plaintiffs' Response at 2, Undisputed Material Fact (UF) ¶ 4. Having carefully reviewed the videos of the incident, the Court concludes there is no dispute as to the characterization. While Mr. Dwight gave the appearance of moving in an unhurried way, only 2 to 3 seconds elapsed between his opening the door and stepping outside the apartment.

[8] Plaintiffs state that Defendants' UF ¶ 11 is immaterial. Plaintiffs' Response at 3 ¶ 7. UF ¶ 11 notes that Ms. Miesch was inside the apartment when Mr. Dwight answered the door and that she was Mr. Dwight's girlfriend or fiancé. Plaintiffs' attempts to controvert UF ¶ 11 do not specifically identify any part of UF ¶ 11 that might be in dispute and do not explain why these facts are immaterial. Instead, Plaintiffs cite legal authority concerning the objective and subjective reasonableness of an officer's actions. UF ¶ 11 is undisputed and is material although the officers were not aware that Ms. Miesch was home at this point in the encounter.

have said "I don't know" or that she was "downtown." When Officer Dye requested permission to check and verify if Mr. Dwight's girlfriend was home, Mr. Dwight refused Officer Dye's request.

Mr. Dwight repeated throughout the encounter that he knew his rights, his "civil rights." Officer Dye asked Mr. Dwight if he had identification, to which Mr. Dwight responded "No." A few moments later, Officer Dye asked Mr. Dwight for his name, and Mr. Dwight said that he did not "feel like disclosing it."

Officer Dye asked Mr. Dwight if he had any weapons on him and Mr. Dwight said "Nope." Officer Dye also asked Mr. Dwight if he had anything on him that would poke Officer Dye. Mr. Dwight said he did not consent to any searches. Officer Dye advised Mr. Dwight that he was going to do a pat down search and instructed Mr. Dwight to turn around and put his hands behind or on top of his head. Mr. Dwight was not cooperative although he was not strongly resisting Officer Dye's attempts.[9] Both officers firmly told Mr. Dwight "to do it now." Officer Dye took hold of Mr. Dwight's right arm,[10] and Mr. Dwight is seen partially turning around, but not fully complying with the instructions. Officer Brionez then attempted to assist Officer Dye by taking hold of Mr. Dwight's right hand or arm. Mr. Dwight grabbed the banister with his left hand and could not be moved far from that position. Mr. Dwight is heard telling the officers that they could not touch him. He asked why he was being arrested and stated he had not done anything wrong. Officer Dye told Mr. Dwight that they were not arresting him but that Mr. Dwight needed to obey. Mr. Dwight responded that he was not going to obey because he was not

---

[9] Defendants state that Mr. Dwight "moved his arm towards Officer Dye, so Officer Dye grabbed his wrist and ordered him to put his hands on his head." UF 18; Dye Aff. ¶ 10. The video does not clearly show whether Mr. Dwight moved his arm towards Officer Dye. It does show that Officer Dye took hold of Mr. Dwight's right wrist and lower forearm. Dye Video Cam.
[10] It is difficult to see much detail in the video recordings at this point in the encounter. Officer Dye's lapel camera provides a more detailed video recording than that of Officer Brionez, which often is unfocused or blurred.

under suspicion of having committed any crime. Officer Dye stated that they were there in response to a domestic call and that they had a reason to be there.

### Officers' Interaction with Ms. Miesch

During the attempted pat down search of Mr. Dwight and about 90 seconds after Mr. Dwight answered the door, a woman's voice is heard on the video saying "Whoa, stop, no." Although Ms. Miesch is not shown yet in the video, Officer Brionez can be seen motioning to her to come outside of the apartment and is heard telling her -"Come outside. We need to talk to you out here."[11] Ms. Miesch told the officers that nothing was wrong. At this point, the videos show that the officers are no longer touching Mr. Dwight.

Mr. Dwight told Ms. Miesch to shut the door but she stated she could not close the door because "his foot is in the way," apparently referring to Officer Dye's foot. Mr. Dwight told the officers that "you're not allowed to block me. This is my house. You're not allowed to violate my civil rights." Officer Dye explained that they were there for a reason. Mr. Dwight said "Let me get my cell phone." Officer Dye pointed at or touched Mr. Dwight's chest and told him he was not moving. Officer Dye directed Mr. Dwight to "Stay put."

Mr. Dwight told Ms. Miesch to go back inside and get her cell phone. Ms. Miesch is heard saying that the initial call for help was made because she had broken a glass. Mr. Dwight continued to instruct Ms. Miesch to get her cell phone so that she could record this encounter. When Mr. Dwight again directed Ms. Miesch to get her cell phone, Officer Dye stated that she was not moving from where she was, which still appeared to be in the doorway.

---

[11] Defendants contend that Ms. Miesch exited the apartment and got between Officer Dye and Mr. Dwight and that she also ran into Officer Dye's arm by getting between him and Mr. Dwight, which forced Officer Dye to let go of Mr. Dwight. UF Nos. 22, 23. The videos do not clearly capture any of this. Instead, the parties' verbal communications in the audios accompanying the videos reflect that Ms. Miesch remained in the apartment doorway, and Officer Brionez repeatedly told Ms. Miesch to come outside so that they could speak to her, which Ms. Miesch refused to do. Based on these communications, it does not appear that Ms. Miesch was outside of the door frame until Officer Dye later grabbed her shirt to keep her from returning back inside the apartment.

The encounter escalated and a physical struggle ensued. Mr. Dwight stated that the officers were not allowed to grab Ms. Miesch, who was screaming "they're hurting me." The video only slightly captures Ms. Miesch, but it does show one or both officers holding onto Mr. Dwight's arms. Ms. Miesch claimed later that Officer Dye pulled on her shirt to prevent her from returning inside the apartment. Officer Dye admitted to pulling Ms. Miesch's shirt to prevent her from returning inside the apartment.

About five minutes into the encounter after Mr. Dwight answered the door, Mr. Dwight asked if he was being detained. Both Mr. Dwight and Ms. Miesch are visible in the video. The officers were not touching either of them. Officer Dye said yes, Mr. Dwight was being detained for domestic violence or for a "domestic." Mr. Dwight stated again that he knew his rights and was versed in the law. "You guys messed up big time. I will be filing a complaint." Both Mr. Dwight and Ms. Miesch attempted to show scratches on their arms to the officers' lapel cameras but the videos do not capture that type of detail.

**Supervisor Sergeant Fincher's Arrival and Interview of Ms. Miesch**

About six minutes after Mr. Dwight opened his apartment door, Sgt. Fincher and Officer Benavidez arrived on the scene. Mr. Dwight stated that he was assaulted by Officers Dye and Brionez. Sergeant Fincher talked to Ms. Miesch downstairs in Officer Dye's presence. She explained that she had been "mad" earlier and had broken a glass in the apartment, and that Mr. Dwight then called the police for assistance. Ms. Miesch said that when the police knocked on the door she told Mr. Dwight to tell them everything was okay since he had made the call to the police. Ms. Miesch claimed that the reason she was mad stemmed from a situation at work on the previous day and that Mr. Dwight had not threatened her. In response to some of the questions from Sgt. Fincher, Ms. Miesch said that Mr. Dwight had a beer that day.

8

**Officer Dye's Arrest of Mr. Dwight**

Mr. Dwight finally admitted to one of the officers that he had made the initial call to the police "because glasses were being broken," but he refused to discuss his reasons for the call. After having spoken to both Mr. Dwight and Ms. Miesch, the officers conferred with one another without recording their discussion. Officer Dye later stated that he made the decision to arrest Mr. Dwight for concealing his identity and refusing to obey the officers. Dye Aff. ¶ 18 (Doc. No. 37–4).

Sergeant Fincher told Mr. Dwight that they were arresting him for concealing his identification and asked him to turn around and place his hands behind his back. Mr. Dwight initially seemed to cooperate although he continued to disagree with the decision to arrest him. Ms. Miesch argued with the officers, claiming that the officers had made the scene and that the officers had not asked her about anything. Ms. Miesch explained that the dispute was not between her and Mr. Dwight, but, instead, concerned her and a work matter. The police reiterated that all they had needed was cooperation.

The charges against Mr. Dwight were dismissed due to the expiration of the six-month rule.[12]

**Summary Judgment and Qualified Immunity**

Rule 56 directs that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact is or cannot be genuinely disputed must support such assertion by "citing to particular parts of materials in the record," including affidavits, or "showing that the materials cited do not establish the absence or presence

---

[12] "Under Rule 7–506(B)… frequently referred to as the six-month rule—the trial of a criminal defendant must commence within 182 days of the latest of several triggering events." *State v. Carroll*, 2015-NMCA-034, 346 P.3d 416, 418, *cert. granted*, 350 P.3d 92 (N.M. 2015).

of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). In evaluating a request for summary judgment, the Court construes the non-movant's evidence as true, and all justifiable and reasonable inferences are drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

To defeat summary judgment, the nonmoving party must come forward with more than a showing of the "existence of a scintilla of evidence in support of the plaintiff's position;" "there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. However, "[a]t the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir.1995) (citation omitted).

Qualified immunity shields law enforcement officials from liability "for civil damages insofar as their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known." *Weise v.* Casper, 593 F.3d 1163, 1166 (10th Cir. 2010) (citation omitted). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009) (citation omitted).

When a defendant raises qualified immunity in a motion for summary judgment, it is the plaintiff's "heavy two-part burden" to show that (1) the defendant violated a constitutional or statutory right and (2) that the constitutional right was clearly established at the time of the challenged conduct. *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (citation omitted). If the plaintiff fails to establish either of the two prongs, the defendant prevails on the defense. *A.M. v. Holmes*, No. 14-2066, 2016 WL 3999756, at *6, __ F.3d ___ (10th Cir. July 25, 2016) (citation omitted). The Court may address either of the two prongs first. *Id.*

10

A constitutional right is clearly established if "the contours of the right [are] sufficiently clear that a reasonable [officer] would understand that what he is doing violates that right." *Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013) (citation omitted); *Courtney v. Oklahoma ex rel., Dep't of Pub. Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013) ("[t]he relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.") (citation omitted). Courts are to exercise "special care" in defining the clearly established right on the basis of the specific context of the case and to avoid defining the case's context in a way "that imports genuinely disputed factual propositions." *Holmes*, 2016 WL 3999756, at *6 (citations omitted).

In *Holmes*, the Tenth Circuit Court of Appeals, instructed:

> Ordinarily, a plaintiff may show that a particular right was clearly established at the time of the challenged conduct "by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, 'the clearly established weight of authority from other courts must have found the law to be as [she] maintains.'" However, "we do not always require case law on point," and "the Supreme Court has warned that 'officials can still be on notice that their conduct violates established law even in novel factual circumstances[.]'"

*Id.* (internal citations omitted). The focus is whether the law at the time of the defendant's conduct provided the defendant with "fair notice" regarding the legality of his conduct. *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004).

If a "plaintiff successfully carries his two-part burden," the "defendant bears the burden, as an ordinary movant for summary judgment, of showing no material issues of fact remain that would defeat the claim of qualified immunity." *Estate of Booker v. Gomez,* 745 F.3d 405, 412 (10th Cir. 2014) (citations omitted). Although the court generally accepts the non-movant's version of the facts, the non-movant's version of the facts must be supported by the record at the

11

summary judgment stage. *Quinn*, 780 F.3d at 1004 (citations omitted). "[W]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version. *Id.*

**Discussion**

I.   **Plaintiffs'' Unlawful Seizure Claims Against Officer Dye** (Counts VI and VII)

    A.   Pertinent Fourth Amendment Law

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Not all seizures are unreasonable, and "not all police-citizen encounters implicate the Fourth Amendment." *United States v. King*, 990 F.2d 1552, 1556–57 (10th Cir. 1993) (citations omitted). In *Payton v. New York,* 445 U.S. 573, 590 (1980), the United States Supreme Court observed that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* Moreover, "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Id.* at 585–86 (citation omitted).

But, this does not mean that the Fourth Amendment is implicated when police officers, without a warrant, approach a home, knock on the door, and attempt to speak with the residents. *Kentucky v. King*, 563 U.S. 452, 469–70 (2011). In those circumstances, an individual is free to answer the door or to decline to answer the door, regardless of whether a police officer or a private individual is at the door. Even if the occupant answers the door and chooses to speak to a police officer, "the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time." *Id.* at 470 (citation omitted).

However, although searches and seizures inside a home without a warrant are presumptively unreasonable, *Payton,* 445 U.S. at 586, the presumption is not absolute. *United States v. Najar*, 451 F.3d 710, 713 (10th Cir. 2006). When faced with special, legitimate law enforcement needs, for example, some warrantless searches or seizures may be found reasonable and not violative of the Fourth Amendment. *Id.* at 714.

A warrantless arrest or detention might be justified if the officer was acting in a "community caretaking" role. *Storey v. Taylor*, 696 F.3d 987, 993 (10th Cir. 2012). In fulfilling certain police functions, officers may exercise community caretaking functions, which are "wholly separate and apart from detecting, investigating, or acquiring evidence of a crime." *Id.* (citation omitted). Police officers are expected to perform functions apart from criminal investigations, e.g., "reduc[ing] the opportunities for the commission of some crimes through preventative patrol and other measures, aid[ing] individuals who are in danger of physical harm, assist[ing] those who cannot care for themselves, resolv[ing] conflict, creat[ing] and maintain[ing] a feeling of security in the community, and provid[ing] other services on an emergency basis." *Najar*, 451 F.3d at 715 (citation omitted). However, a warrantless detention under the community caretaking exception "must be based upon specific and articulable facts which reasonably warrant an intrusion into the individual's liberty." *Storey*, 696 F.3d at 993 (citation omitted). And, the government's interest must outweigh the individual's interest in being free from arbitrary governmental interference. *Id.*

13

B.  Analysis of the Seizure Claims

1.  ***Officer Dye's Order to Open the Door (Count VI)*** [13]

A police order to come out of the home or to open up the door may be considered an unlawful seizure. "[I]f an individual's decision to open the door to his home to the police is not made voluntarily, the individual is seized inside his home." *United States v. Reeves*, 524 F.3d 1161, 1168 (10th Cir. 2008) (citation omitted). "Opening the door to one's home is not voluntary if ordered to do so under color of authority." *Id.* at 1167. In making this determination, the court asks if a reasonable person confronted by police officers outside the door, under the circumstances, would have believed he had to open the door to his home and submit to the show of police authority. *Id.* at 1168. *See also King*, 990 F.2d at 1556 (noting that the pertinent inquiry is would the police conduct at issue have communicated to a reasonable person that the person was not free to terminate the encounter).

Mr. Dwight argues that he did not open the door voluntarily and that a reasonable person would not have felt free to disregard the police officers' persistent knocking at the door. Thus, according to Mr. Dwight, Officer Dye's knocking and/or command to "open up" amounted to an unlawful seizure under the Fourth Amendment. In addition, Mr. Dwight cites a number of Tenth Circuit Court of Appeals opinions and a Supreme Court decision in support of his position that it was clearly established as of June 28, 2014, that an officer's order for a resident to open his door is a seizure inside the home that requires a warrant, or probable cause of a crime as well as an exception to the warrant requirement. Plaintiffs' Motion at 10–11; Plaintiffs' Response at 11.

---

[13] The Court analyzes this claim with respect to only Mr. Dwight as Ms. Miesch did not allege that she was seized by the officers' presence at the door. *See* Complaint, Count VI ("Unreasonable Seizure for Ordering Plaintiff Dwight to Answer the Door"). In addition, at the August 23, 2016 hearing, Plaintiffs' counsel stated that Ms. Miesch was not claiming that she, too, was seized when Officer Dye knocked at the door. 8/23/16 Minutes, at 3.

Officer Dye contends that there is no evidence to show that Mr. Dwight opened his door or stepped outside his home in response to Officer Dye's order. Defendants' Response at 14. Defendants assert that Mr. Dwight has offered no evidence that he heard Officer Dye's announcement and order, and that, instead, Mr. Dwight has only said that he responded to "officers pounding loudly on the door to the apartment." UF No. 7 (Doc. No. 37). Thus, Officer Dye takes the position that there was no seizure since Mr. Dwight did not submit to a show of authority.

The following facts are undisputed: Officer Dye and Officer Brionez did not have a warrant when they responded to a possible domestic disturbance call and knocked at Plaintiffs' apartment door; Officers Dye and Brionez were concerned about the well-being of the occupants and believed they needed to confirm that the occupants were safe before they could leave the apartment;[14] Officer Dye knocked at Plaintiffs' door three separate times over a period of about two minutes before stating, "Albuquerque Police, open up"; Mr. Dwight heard loud knocking at the door; Mr. Dwight did not open the door until after Officer Dye had knocked for the fourth time, which was also after Officer Dye had issued a command to open up (after the third series of knocks); and, when Mr. Dwight opened the door, he stepped outside his apartment onto the balcony with the two officers and closed the door behind him.

This is not a case where the Court has affidavit or deposition testimony stating that Mr. Dwight opened the door because he heard Officer Dye issue an order to open up, that he heard a series of knocking at the door, or that he knew that police officers were outside his door. The evidence does not establish why Mr. Dwight opened the door when he did or if he heard some or

---

[14] Although the parties do not set forth an undisputed fact to this effect, the video recordings make clear that both Officers Dye and Brionez explained to Plaintiffs that they needed to confirm the safety and well-being of occupants when responding to a domestic disturbance call and that they could not leave the premises until they had this information.

all of the knocking. Mr. Dwight may not have heard all of the knocking at his door since the television was on and the dog was barking. Moreover, at the August 23 motion hearing, Plaintiffs' counsel acknowledged that there was no explicit evidence in the record to show that Mr. Dwight heard Officer Dye's announcement and responded to it by opening the door.[15] 8/23/16 Minutes at 2. Rather, Plaintiffs surmise that Mr. Dwight must have opened the door in response to Officer Dye's command since he did not open the door until after the third set of knocking or until after Officer Dye issued the command to open up. Plaintiffs also emphasize that the officers intended to use their authority to force the residents to open the door, but the officers' subjective intentions do not inform the inquiry. The question is whether a reasonable person, facing these circumstances, would have felt free to disregard the knocking at the door.

Mr. Dwight relies primarily on *United States v. Flowers*, 336 F.3d 1222 (10th Cir. 2003) in support of his unlawful seizure claim. In *Flowers*, police officers went to the suspect's home in response to information that liquor and other items were being sold illegally from the residence. *Id.* at 1223. The police also were aware that this residence had previously been a "juice joint" several years earlier. *Id.* The officers knocked at the door without identifying themselves and Mr. Flowers answered by asking what the individual wanted. One of the officers answered "T bird," a slang term for cheap wine. *Id.* at 1224. When Mr. Flowers stated he did not have that type of wine, the officers asked what he did have, and the occupant said he had a different wine which he offered to the officers by opening a panel adjacent to the door. The officer then said, "Tulsa Police Department, open the door." *Id.* Mr. Flowers complied. The *Flowers* Court held that police officers unlawfully seized Mr. Flowers inside his home without a warrant when Mr. Flowers opened the door in response to a police command. *Id.* at 1225.

---

[15] Based on Plaintiffs' failure to explain what prompted Mr. Dwight to answer his door and his attorney's concession about a corresponding "gap in the evidence," it is unclear why Mr. Dwight did not voluntarily dismiss this claim.

It was clear in *Flowers* that the occupant opened the door in direct response to a police order that the occupant undisputedly heard. Thus, the critical facts and circumstances in *Flowers* are distinguishable from the facts in this case where there is no evidence as to what Mr. Dwight heard or why he opened the door. In addition, in *Flowers*, a critical inquiry was whether exigent circumstances were present to justify the officers' action, *id.* at 1227, 1229–31, an argument that is not made in this case.

The Court concludes that the evidence is disputed or undeveloped as to what circumstances Mr. Dwight actually faced, e.g., whether he heard the police outside his door and whether he heard all of the knocking at the door. Based on a lack of evidence, the Court cannot determine whether or not Mr. Dwight acted voluntarily in answering his door. Stated differently, if Mr. Dwight answered the door after hearing only one series of knocks and/or if he did not hear the police officer's announcement, his conduct might be considered voluntary. Therefore, the Court will deny Plaintiffs' motion for summary judgment on Mr. Dwight's unlawful seizure claim (Count VII).

With respect to Officer Dye's assertion of qualified immunity, Mr. Dwight must demonstrate, on the facts alleged, that Officer Dye violated a constitutional right that was clearly established at the time of the alleged unlawful activity. *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010). It was clearly established at the pertinent time that an unlawful Fourth Amendment seizure may occur when a reasonable person would not have felt free to disregard a police order at the door of a home to open up and where that person submitted to a show of police authority by opening the door. *Reeves*, 524 F.3d at 1167. *See, e.g., Storey*, 696 F.3d at 993 ("[a]bsent exigent circumstances, [police officer] had no basis on which to order [the resident] out of his house.").

17

The problem with Mr. Dwight's unlawful seizure claim, at the qualified immunity stage, is that he has not presented evidence of what he heard at the time he opened the door to his home and whether he opened the door in response to a police presence.[16] Plaintiffs' counsel represented at the August 23 motion hearing that no reasonable person would have felt at liberty to ignore the loud and consistent knocking at the door. But, Mr. Dwight did not present evidence that he actually heard loud and consistent knocking before he answered the door. Thus, the Court is unable to determine, under these circumstances, that a reasonable person would have felt compelled to answer the door. Accordingly, because Mr. Dwight has not carried his burden of showing a violation of his constitutional right for purposes of satisfying both prongs of he qualified immunity test, the Court will grant Defendants' motion for qualified immunity on Mr. Dwight's unlawful seizure claim (Count VI), which it will dismiss with prejudice.

## 2. *Officer Dye's Action in Grabbing Ms. Miesch (Count VII)*

There are no genuine disputes of material facts regarding Officer Dye's seizure of Ms. Miesch. It is undisputed that Officer Dye grabbed Ms. Miesch's shirt to prevent her from "returning inside the apartment" and that Ms. Miesch was not free to terminate the encounter once she opened the apartment door. UF Nos. 22–23, 25–26. *See also* Dye Discovery Responses, Request for Admission No. 11 (Doc. No. 42–3). Officer Dye's action in restraining Ms. Miesch's movement is a violation of the Fourth Amendment unless the seizure was reasonable. *See Becker*

---

[16] At the qualified immunity stage, the Court takes the plaintiff's allegations as true, *Mecham v. Frazier*, 500 F.3d 1200, 1204 (10th Cir. 2007), but Mr. Dwight did not allege how much knocking he heard or that he answered the door in response to the police announcement.

*v. Kroll*, 494 F.3d 904, 914 (10th Cir. 2007) ("Violation of the Fourth Amendment requires an intentional acquisition of physical control.").[17]

Officer Dye argues that the seizure of Ms. Miesch was reasonable because he acted out of a concern for the safety of the officers and of Mr. Dwight. Defendants' Motion at 18. Officer Dye also asserts that his action in grabbing Ms. Miesch was reasonable when judged "from the perspective of a reasonable officer on the scene" and was a "minor intrusion into Ms. Miesch's freedom of movement." *Id.* at 18–19. Officer Dye does not specifically argue that he was exercising a community caretaking function when he grabbed Ms. Miesch's shirt to prevent her from turning back into the apartment. However, Defendants generally argue that the officers were acting as community caretakers "at the time of their encounter with Plaintiffs" and that in completing a noninvestigatory function, a police officer might need to seize a person for Fourth Amendment purposes.[18] *Id.* at 14, 15. In addition, Defendants contend that even if Officer Dye was not acting as a community caretaker and the encounter is, instead, construed as an investigatory detention, there was reasonable suspicion of criminal activity that justified Officer Dye's actions. *Id.* at 13.

The Court first rejects Officer Dye's alternative argument concerning an investigative detention and *Terry* stop analysis because it is clear that warrantless seizures in the home are presumptively unreasonable absent exigent circumstances and Officer Dye makes no exigency argument. *See Manzanares v. Higdon*, 575 F.3d 1135, 1142 (10th Cir. 2009) (noting that even where probable cause exists to believe that incriminating evidence will be found within a home,

---

[17] While there are disputed facts as to where Ms. Miesch was standing when Officer Dye grabbed her shirt, the Court finds these disputes immaterial in evaluating the reasonableness of Officer Dye's seizure of Ms. Miesch. Officer Dye claims that Ms. Miesch was standing outside the door threshold when he grabbed Ms. Miesch's shirt, but Officer Dye does not specifically argue that Ms. Miesch's location should alter the analysis. Instead, Officer Dye relies on allegations about Ms. Miesch's location in an attempt to distinguish a case relied on by Plaintiffs. Defendants' Response at 15.

[18] It is difficult to sort out Defendants' arguments specific to each of Plaintiffs' claims because Defendants generally presented the same overall argument as to four different claims. Defendants' Motion at 12–21.

police may not enter the home without a warrant absent exigent circumstances or consent); *Pleasant v. Lovell*, 876 F.2d 787, 795–96 (10th Cir. 1989).

However, the community caretaker function is an exception to the warrant requirement. While the community caretaker function typically has been applied to facts involving automobile seizures, it also may apply to the seizures of individuals. *United States v. Garner*, 416 F.3d 1208, 1213–15 (10th Cir. 2005) The Tenth Circuit Court has recognized that a police officer, when acting in the community caretaking role, might need to seize a person for Fourth Amendment purposes "to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity." *King*, 990 F.2d at 1560 (citation omitted). "Whether the seizure of a person by a police officer acting in his … noninvestigatory capacity is reasonable depends on whether it is based on specific articulable facts and requires a reviewing court to balance the governmental interest in the police officer's exercise of his … 'community caretaking function' and the individual's interest in being free from arbitrary governmental interference." *Id.* (citation omitted). For example, the governmental interest in the safety of police officers outweighs an individual's Fourth Amendment rights when an officer has an objective basis to believe that the person being detained is armed and dangerous. *Id.* at 1561.

Defendants presented no evidence or even argument that Officer Dye had probable cause to believe that a domestic abuse crime was occurring at Plaintiffs' apartment. Nor do Defendants contend that Officer Dye had any basis to believe that Ms. Miesch was armed or dangerous when he grabbed Ms. Miesch's shirt. *See* Defendants' Motion at 18; Defendants' Reply at 9–10; Defendants' Response at 15. Officer Dye's primary argument is conclusory and speculative – Ms. Miesch's intended return inside the apartment threatened the safety of the officers and/or Mr. Dwight because the officers' investigation was ongoing. Moreover, it is unlikely that Officer

20

Dye feared for Mr. Dwight's safety when it is undisputed that Ms. Miesch turned to go inside the apartment after Mr. Dwight instructed her to get her cellphone in the apartment so that she could record the encounter.

Officer Dye's generalized argument about possible safety concerns does not provide the required specific and articulable facts of a dangerous situation or of a risk to officer safety that would have justified Officer Dye's action in grabbing Ms. Miesch's shirt. Officer Dye admitted that he did not observe an emergency at any time during his interaction with Plaintiffs. Dye Discovery Responses, Request for Admission No. 11 (Doc. No. 42–3). The fact that Officers Dye and Brionez were responding to a possible domestic disturbance is not sufficient alone to reasonably warrant the intrusion, *albeit* the brief intrusion, on Ms. Miesch's liberty. *See Storey*, 696 F.3d at 994 ("officers responding to a report of a domestic dispute must point to *something* beyond the mere fact of an argument to demonstrate an 'objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others.'") (emphasis in original) (citation omitted).

While the Court evaluates the reasonableness of Officer Dye's action from the perspective of a reasonable officer faced with split-second decision-making, the Court concludes that Officer Dye's seizure of Ms. Miesch was not a reasonable response to the circumstances. Undoubtedly, Officer Dye encountered a situation that was confusing where neither Mr. Dwight nor Ms. Miesch was as cooperative as one would hope, particularly in view of Mr. Dwight's decision to call for police assistance. But, there simply is no objective evidence that Ms. Miesch posed a threat to the officers' safety. The Court concludes that the seizure of Ms. Miesch was not reasonable and that Officer Dye has not come forward with evidence sufficient to meet the

community caretaking exception to a warrantless seizure. Thus, Officer Dye's seizure of Ms. Miesch was a violation of Ms. Miesch's Fourth Amendment rights.

       a.   *Officer Dye's Motion for Qualified Immunity*

In examining "the record from the viewpoint of a "prudent, cautious, and trained" officer," *Lundstrom*, 616 F.3d at 1124–25,  the Court concludes that Officer Dye did not have objectively reasonable grounds to seize Ms. Miesch. Stated differently, a reasonable officer would have understood that grabbing Ms. Miesch's shirt violated her constitutional right to be free from an unreasonable seizure. Moreover, it was clearly established by June 2014 that a community caretaking detention had to be based on specific articulable facts to warrant an intrusion into a person's liberty, which Officer Dye has failed to present. *See Garner*, 416 F.3d at 1213 (citation omitted). Therefore, the Court will deny Defendants' motion for qualified immunity on Ms. Miesch's unlawful seizure claim against Officer Dye (Count VII).

       b.   *Ms. Miesch's Motion for Summary Judgment*

The Court has found that an unlawful seizure of Ms. Miesch occurred. The Court has also determined that Officer Dye is not entitled to qualified immunity since a reasonable officer would have known, under the circumstances, that grabbing Ms. Miesch's shirt to prevent her from moving back inside her apartment was an unlawful seizure in violation of her constitutional right and that the constitutional right was clearly established.

Based on these determinations, the Court will grant Plaintiffs' motion for summary judgment on Ms. Miesch's unlawful seizure claim against Officer Dye. *See Roska ex rel. Roska v. Sneddon*, 437 F.3d 964, 970 n.3 (10th Cir. 2006) (noting that where the court had previously held that the defendants violated the plaintiffs' clearly established constitutional right, "the effect of the district court's subsequent conclusion that there were no genuine issues of material fact

22

and [that] [d]efendants were not entitled to qualified immunity was a grant of summary judgment to [p]laintiffs on liability.") A jury will decide the question of damages as to Ms. Miesch's unlawful seizure claim against Officer Dye (Count VII).

II.    **Mr. Dwight's Unlawful Pat Down Claim Against Officer Dye and Officer Brionez (Count IX)**

    A.    Pertinent Fourth Amendment Law

A pat down search is a search under the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 19 (1968). In *Terry,* the Supreme Court held that an officer may conduct a reasonable pat down search for weapons while investigating an individual for suspicious behavior if the officer has reasonable suspicion that the individual is armed and dangerous to the officer or others. *Id.* at 19, 24, 27. During an investigative detention, police officers are authorized to take reasonable steps necessary to secure their safety and maintain the status quo, which may include a pat down search. *United States v. Garcia*, 459 F.3d 1059, 1063 (10th Cir. 2006).

Stated differently, the primary justification for a pat down search is an officer's concern for safety and the safety of any other person in danger. *Terry*, 392 U.S. at 27. An officer is not required to take unnecessary risks in performing his duties, and may conduct a pat down search for weapons in some instances to allay safety concerns. *Garcia*, 459 F.3d at 1063. While an officer need not be absolutely certain that an individual is armed before conducting a pat down search, a pat down search is not routinely conducted as part of every investigative detention. *Id.* at 1063–64 (citation omitted).

The Court examines the facts available to the officer "that would warrant a man of reasonable caution to believe that a frisk would be necessary to protect himself." *Id.* at 1064. The officer must justify a pat down search with "articulable" suspicion rather than inchoate

suspicions or hunches. *Id.* The Court views "the officer's conduct through a filter of common sense and ordinary human experience" and considers the totality of the circumstances. *Id.*

      B.     <u>Analysis of Mr. Dwight's Pat Down Claim</u>

      In addition to the facts already discussed, the following facts are undisputed: Mr. Dwight opened his door and stepped out onto the apartment landing balcony, facing the officers with his back against the balcony railing; Officer Dye explained to Mr. Dwight that they were responding to a call about a possible domestic disturbance and asked Mr. Dwight if he had made a call to 9–1–1, which Mr. Dwight denied; Officer Dye asked if Mr. Dwight's girlfriend was home and Mr. Dwight said she was not home; the officers explained to Mr. Dwight that they needed to confirm the safety of his girlfriend if she was home, but Mr. Dwight refused to allow the officers to inspect his apartment; Officer Dye asked for Mr. Dwight's name or identification which Mr. Dwight refused to give; Mr. Dwight's hands were visible on the video recording throughout this encounter and he had nothing in his hands; Officer Dye could not see Mr. Dwight's backside and did not know if there was a weapon in his waistband; about one minute after Mr. Dwight opened the door, Officer Dwight asked if Mr. Dwight was armed and whether there was anything on him that would poke the officer; Mr. Dwight denied being armed and promptly stated he did not consent to any search; both Officer Dye and Brionez directed Mr. Dwight to turn around and place his hands behind or on top of his head; initially, Mr. Dwight partially raised his hands; both officers grabbed Mr. Dwight in trying to turn him around but Mr. Dwight resisted by holding onto the railing with one hand; Mr. Dwight had partially turned around and appeared to be passive, but he was not cooperating in allowing the pat down search; he asked the officers what crime he had committed and why he was being arrested; the officers told him that he was not arrested yet but that he "needed to obey;" the officers again told Mr. Dwight that they were there

on a domestic call; Mr. Dwight stated he did not need to obey the officers as he was not under suspicion of having done anything wrong; the officers continued to physically struggle with Mr. Dwight in trying to turn him around; after about 30 seconds, Ms. Miesch opened the door and asked what was going on; the officers stopped trying to conduct the pat down search of Mr. Dwight as they continued to talk to both Plaintiffs; the officers did not complete the pat down search of Mr. Dwight.

Officer Dye contends that he had developed reasonable suspicion of criminal activity when he and Officer Brionez tried to pat down Mr. Dwight. Defendants' Motion at 21. Defendants state that, at a minimum, Officer Dye suspected Mr. Dwight had obstructed his investigation and had concealed his identification in violation of the City of Albuquerque Ordinances, §§ 12-2-16 and 12-2-19.[19] According to Defendants, Mr. Dwight was acting suspiciously by keeping his back to the railing, and was uncooperative, evasive, obstructive, and untruthful, which together gave the officers "lawful reason to conduct a protective sweep to ensure [their] safety …." Defendants' Motion at 21–22.

The Court recognizes that the test for reasonable suspicion sufficient to justify a pat down search must meet only a "minimum level of objective justification." *United States v. Garcia*, 751 F.3d 1139, 1143 (10th Cir. 2014) (citation omitted). Moreover, in at least one case, the Tenth Circuit Court has held that an officer's safety concern justified a pat down where the officer had limited specific information leading him to believe a suspect was armed and no knowledge that the individual had a weapon. *See United States v. McRae*, 81 F.3d 1528, 1536 (10th Cir. 1996).

---

[19] The Court will analyze Defendants' position about Mr. Dwight's possible violations of City Ordinances with respect to the false arrest claim. *See infra*. However, it does not appear that the officers could have reasonably suspected that Mr. Dwight had violated several City Ordinances before the attempted pat down search because the officers had only interacted with Mr. Dwight for about 45 seconds. At that point, Officer Dye suspected Mr. Dwight was being evasive but he had no proof of any falsehoods.

However, Defendants fall short in presenting evidence that Officer Dye and Officer Brionez held an "articulable and reasonable suspicion" that Mr. Dwight was armed and dangerous so as to justify the pat down search. The encounter between Mr. Dwight and the officers took place around mid-day on a Saturday in an outdoor balcony of an apartment complex, rather than at night or in a high-crime area. When Mr. Dwight exited the apartment to speak with the officers, it is not clear that Mr. Dwight had any other natural way to stand and face the officers except to have his back against the balcony. Mr. Dwight did not appear particularly nervous on the video recordings, and while Officer Dye later stated that he could smell alcohol from Mr. Dwight's facial area, Mr. Dwight does not appear drunk on the video. Mr. Dwight never looks menacing or aggressive on the video recordings. He did not do anything to threaten the officers. Instead, his hands, at times, are limp and he looks almost passive although he clearly is verbally combative with the officers, which undoubtedly was frustrating and confusing to the officers in responding to a call for help in relation to a possibly volatile domestic disturbance. But, this is not a case, for example, where a single officer faced Mr. Dwight or where the officers needed to conduct a search of the premises that would require them to turn their backs to Mr. Dwight. The officers had no information of prior domestic disturbances at this address, nor were they aware that Mr. Dwight had a previous criminal history. *See, e.g., United States v. Santos*, 403 F.3d 1120, 1132 (10th Cir. 2005) ("in conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus").

While it is understandable that the officers felt Mr. Dwight was evasive and untruthful in responding to questions, the Court does not evaluate the officers' states of mind in measuring reasonable suspicion. *See, e.g., United States v. Whitley*, 680 F.3d 1227, 1234 (10th Cir. 2012) (officer's subjective motives are irrelevant). Instead, the Court looks at the objective facts from

26

the perspective of a "reasonable man." When the officers began to conduct the pat down search of Mr. Dwight, they had only asked him a few questions over about a 45 second period. At the time of the attempted pat down search, Officers Dye and Brionez did not know that Mr. Dwight had lied to them about his girlfriend being home because that became clear moments after the attempted pat down search. Moreover, there had been no visible signs of ongoing domestic abuse or violence at Plaintiffs' apartment. Thus, the Court concludes that Officer Dye's and Officer Brionez's attempted pat down search of Mr. Dwight was not a reasonable response to the totality of circumstances they encountered.

In reaching this conclusion, the Court had considered a totality of circumstances, including the officer's reasonable inferences based on their many years of experience as police officers, as well as the well-known dangers that domestic violence calls present to the police. *See, e.g., Wilson v. Jara*, 866 F. Supp. 2d 1270, 1282 (D.N.M. 2011) (noting testimony by police that officers "are on heightened alert with domestic violence calls because they are the type of incidents where an officer is most likely to be injured or killed"). However, the Court is not convinced that the officers' concerns about Mr. Dwight's evasiveness, possible untruthfulness, verbal argumentativeness, lack of cooperation, and positioning on the balcony are sufficient to satisfy the minimum level of objective justification required to show reasonable suspicion. In other words, while Officer Dye and Officer Brionez argue generally that they had concerns about their safety, their suspicions that Mr. Dwight might be armed or dangers were not "articulable," nor were there specific reasonable inferences that could be drawn from the circumstances. Therefore, the Court concludes that the attempted pat down search of Mr. Dwight by Officer Dye and Officer Brionez was unreasonable.

   1.   *Officer Dye's and Officer Brionez's Motion for Qualified Immunity*

The Court has determined that the attempted pat down search of Mr. Dwight was not reasonable, and was, therefore, violative of the Fourth Amendment. Even viewing the officers' conduct through the lens of their community caretaking authority, the Court concludes that Defendants failed to offer specific and articulable facts sufficient to rise to a reasonable suspicion that Mr. Dwight was armed and dangerous. Therefore, the pat down search violated Mr. Dwight's constitutional rights. Accordingly, Plaintiffs have satisfied the first prong of the qualified immunity inquiry. *See* discussion *supra.*

The next question is whether Mr. Dwight's constitutional right to be free from the pat down search under the circumstances was clearly established at the time of the encounter. While there need not be a case precisely on point, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Quinn*, 780 F.3d at 1004–05. At the time of the encounter, it was clearly established that to conduct a pat down search, an officer had to have reason to believe the suspect was armed and dangerous. *Terry*, 392 U.S. at 21, 27. The officers stated reasons for believing Mr. Dwight was possibly armed and dangerous are more like nascent suspicions or hunches than "articulable suspicion." Under the circumstances, a reasonable officer would have understood that the attempted pat down search of Mr. Dwight was unreasonable.

Even if Officer Dye and Officer Brionez were acting in their community caretaker function, they did not articulate "specific and articulable facts which reasonably warrant[ed] an intrusion into [Mr. Dwight's] liberty." *See Storey*, 696 F.3d at 992 (citation omitted). It was clearly established in 2014 that, like an investigative *Terry* detention, a community caretaking detention must also be based on specific and articulable facts" to justify the detention.

28

*Lundstrom*, 616 F.3d at 1120 (citation omitted). Defendants failed to present the required specific and articulable facts that might have supported the pat down search. Therefore, the Court will deny Defendants' motion for qualified immunity as to the pat down search of Mr. Dwight by Officer Dye and Officer Brionez. (Count IX).

2. ***Mr. Dwight's Motion for Summary Judgment***

The Court has found that a reasonable officer would have known, under the circum-stances in this case, that the attempted pat down search of Mr. Dwight was an unlawful search in violation of Mr. Dwight's constitutional rights. The Court also determined that the constitutional right was clearly established. Based on the Court's qualified immunity analysis as to Mr. Dwight's unlawful pat down search claim against Officers Dye and Brionez, the Court will grant Mr. Dwight's motion for summary judgment on Count IX. *See Roska,* 437 F.3d at 970 n.3 (noting that where the court had previously held that the defendants violated the plaintiffs' clearly established constitutional right, "the effect of the district court's subsequent conclusion that there were no genuine issues of material fact and [that] [d]efendants were not entitled to qualified immunity was a grant of summary judgment to [p]laintiffs on liability.") A jury will decide the question of damages as to Mr. Dwight's unlawful search claim against Officers Dye and Brionez (Count IX).

**III.    Mr. Dwight's Unlawful Arrest Claim Against Officer Dye (Count XI)**

A. Pertinent Fourth Amendment Law

A police officer may make a warrantless arrest under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed. *See United States v. Watson*, 423 U.S. 411, 417–424 (1976). The validity of the arrest does not depend on whether the suspect actually committed a crime. *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979).

The key question is whether the officer had knowledge of evidence that would provide him with probable cause to arrest the suspect on some ground. *Apodaca v. City of Albuquerque*, 443 F.3d 1286, 1289 (10th Cir. 2006).

"Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she had reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1216 (10th Cir. 2008) (citation omitted). "This is an objective standard, and thus the subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive." *Koch v. City of Del City*, 660 F.3d 1228, 1239 (10th Cir. 2011).

"[W]hen an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt. The arrest is constitutionally reasonable." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1281 (10th Cir. 2008) (citation omitted). In addition, "the defendant arresting officer is entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest the plaintiff." *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995) (citations omitted). "[A]n officer's reasonable mistake of fact [and reasonable mistakes of law] can still justify a probable cause or reasonable suspicion determination. . . " *United States v. Nicholson*, 721 F.3d 1236, 1238 (10th Cir. 2013*), abrogated in part by Heien v. North Carolina*, ⸻ U.S. ⸻, 135 S.Ct. 530, 534 (2014).

B.  Parties' Positions

Officer Dye argues that he had probable cause to arrest Mr. Dwight based on Mr. Dwight's violation of two Albuquerque City Ordinances, § 12-2-19 and § 12-2-16. Defendants'

Motion at 27–28. In addition, Defendants briefly mention a third Albuquerque City Ordinance

that Mr. Dwight may have violated, § 12-2-15, by allegedly having made or filed a "false report"

when he called for police assistance and then later denied having called in the first place.[20]

Defendants' Reply at 12; Defendants' Response at 22.

> Albuquerque City Ordinance § 12-2-19 provides in pertinent part:
>
> Resisting, obstructing or refusing to obey an officer consists of either:
>
>> (B) Resisting or abusing any judge, magistrate or peace officer in the lawful discharge of his duties; or
>>
>> (C) Refusing to obey or comply with any lawful process or order given by any police officer acting in the lawful discharge of his duties; or
>>
>> (D) Interfering with, obstructing or opposing any officer in the lawful discharge of his regular and affixed duties.
>
> Albuquerque City Ordinance § 12-2-16 states:
>
>> It is unlawful for anyone to conceal one's true name or identity or disguise oneself with the intent to obstruct due execution of the law or with the intent to intimidate, hinder or interrupt any public officer, police officer, or any other person in the legal performance of his or her duties.

Defendants assert that Mr. Dwight obstructed Officer Dye's investigation beginning

when Mr. Dwight refused to give his name or identity and continuing throughout the encounter

with the police. Defendants' Motion at 28. According to Defendants, Mr. Dwight's lack of

cooperation, refusal to reveal his name, and failure to explain that he had made the call for police

assistance, in combination, provided Officer Dye with probable cause to make the arrest for

violating the City Ordinances. Officer Dye also argues that even if he was mistaken as to the

---

[20] The Court does not analyze Defendants' position concerning a possible violation of City Ordinance § 12–2–15 because Defendants failed to supply evidence to establish reasonable suspicion of a violation of this ordinance. Moreover, Defendants' argument regarding this ordinance is cursory at best.

existence of probable cause, his mistake was reasonable, which, therefore, still entitles him to qualified immunity.

Mr. Dwight contends, *inter alia*, that the police officers were not engaged in the lawful discharge of their duties when they detained and arrested him. Plaintiffs' Motion at 21–23. Mr. Dwight also argues that Officer Dye did not have probable cause to arrest him for obstructing a police officer under Albuquerque City Ordinance, § 12-2-19 because Mr. Dwight's alleged evasiveness is not a lawful basis for obstruction.

In support, Mr. Dwight relies, in part, on *Keylon*, 535 F.3d at 1216–17, where the Tenth Circuit Court analyzed New Mexico statute § 30–22–1 that contains very similar language to City Ordinance § 12-2-19. Violations of either the state statute or the ordinance include resisting or obstructing an officer in the lawful discharge of duties.

In *Keylon*, the officer claimed he had probable cause to suspect that the plaintiff had violated NMSA § 30–22–1 based on the plaintiff's evasive answers to the officer's questions. *Keylon*, 535 F.3d at 1216. The Tenth Circuit observed that under New Mexico law, "resisting, evading, or obstructing an officer primarily consists of physical acts of resistance." *Id.* (citation omitted). The Tenth Circuit Court also noted that while New Mexico courts had found that NMSA § 30–22–1 prohibited certain "abusive" speech, the state courts had not criminalized speech that was "merely evasive." *Id.* at 1217 (citation omitted). The *Keylon* court, relying on New Mexico opinions, defined "abusive speech" as "fighting words," which tend to incite an immediate breach of the peace." *Id.* In *Keylon*, the Tenth Circuit Court found that the plaintiff's failure to provide the police with certain personal identification information did not amount to "fighting words." *Id.* Thus, the officer did not have probable cause to believe the plaintiff violated NMSA § 30–22–1.

Mr. Dwight also relies on *Manzanares v. Higdon*, 575 F.3d 1135 (10th Cir. 2009), where the Tenth Circuit Court again examined NMSA § 30–22–1, along with the similar City Ordinance, § 12–2–19(D),  and held that the officer could not have reasonably believed that the plaintiff was resisting or obstructing an officer under New Mexico law. *Id.* at 1144–45. In *Manzanares*, the officer's "sole basis for guessing" that the plaintiff had violated either NMSA § 30–22–1 or City Ordinance, § 12-2-19(D) "was the pure speculation that the plaintiff could have been more cooperative and shared more information. An unsubstantiated hunch cannot constitute probable cause." *Id.* at 1145 (citation omitted). Mr. Dwight likens Officer Dye's suspicions that Mr. Dwight was being untruthful and was hiding something to "hunches" or speculation that the *Manzanares* Court found insufficient. Plaintiffs' Motion at 21.

Officer Dye argues that the Court should not consider the Tenth Circuit Court and New Mexico state court cases cited by Mr. Dwight because they addressed NMSA § 30-22-1 rather than the City Ordinances on which Officer Dye relies. Defendants' Response at 21. However, Officer Dye offers no legal basis for disregarding these cases interpreting NMSA § 30-22-1, which is substantially similar in language to the pertinent City Ordinances.

In *State v. Wade*, 100 N.M. 152, 154–55 (Ct. App. 1983) , the New Mexico Court of Appeals reasoned that NMSA § 30-22-1 prohibited only "abusing" speech or "fighting words" because any broader interpretation of NMSA § 30–22–1, as applied to speech, would render the statute unconstitutional. An argument that a City Ordinance prohibits more than this limited category of speech would be unpersuasive. In sum, the Court finds the case law addressing NMSA § 30-22-1 to be instructive in evaluating whether Officer Dye had probable cause to arrest Mr. Dwight for alleged violations of the City Ordinances. *See Kaufman v. Higgs,* 697 F.3d 1297, 1300 (10th Cir. 2012) ("where the context is an alleged false arrest for a purported state

33

offense, state law is of inevitable importance" even in evaluating federal law regarding the defense of qualified immunity).

    C.  <u>Analysis of False Arrest Claim</u>

    Mr. Dwight emphasizes that his alleged evasiveness is not a lawful basis for obstruction and that, even if it were a lawful basis to show obstruction, the officers were not engaged in the lawful discharge of their duties when Mr. Dwight purportedly obstructed the investigation.

    First, Officer Dye does not rely exclusively on Mr. Dwight's evasiveness as support for his belief that probable cause existed to arrest Mr. Dwight. *Compare Manzanares*, 575 F.3d at 1144–45. Officer Dye represented that Mr. Dwight was uncooperative throughout the encounter, pulled away from the officers during the attempted pat down search, refused to give the officers his name, and lied that his girlfriend was not inside the apartment, in addition to being generally evasive in responding to the officers' questions. *See* Dye Responses to Discovery (Doc. No. 44–6); Transcript of Dye Interview (Doc. No. 42–1). The Court examines a totality of the circumstances in evaluating whether a reasonable officer would believe that there was probable cause to arrest in a given situation. *Koch*, 660 F.3d at 1239.

    Second, the Court finds that Officers Dye and Brionez were lawfully discharging their duties when they responded to the domestic disturbance call and arrived at Mr. Dwight's apartment to investigate. *See City of Roswell v. Marin*, No. 34,286, 2015 WL 6034246, at *1 (Ct. App. Sept. 2, 2015) (observing that there was no dispute that police, who were responding to and investigating a reported domestic disturbance, were engaged in the lawful discharge of their duties). But, that finding does not mean that all of Officer Dye's and Officer Brionez's subsequent actions and orders were lawful.

Mr. Dwight's alleged interference, obstruction, resistance, and/or non-compliance involved Mr. Dwight's responses to police actions or orders that the Court has already found unlawful, i.e., the pat down search and the seizure of Ms. Miesch. Accordingly, Officer Dye was not engaged in the lawful discharge of his duties when he and Officer Brionez tried to force Mr. Dwight to submit to a pat down search and when Officer Dye interfered with Ms. Miesch's attempt to turn back into her apartment. It follows that Mr. Dwight's refusal to submit to the pat down search, as well as his objections to the search and to the seizure of Ms. Miesch, are not construed as refusals to obey or interference with *lawful* commands.

Moreover, even if the officers' actions or orders were lawful, the undisputed evidence does not show that Mr. Dwight actively resisted, obstructed, or interfered with the officers' investigation. Other than to provide some physical resistance to the unlawful pat down search, Mr. Dwight always held his hands in plain view. His body movements in response to police requests and orders generally appeared passive, slow, and, at times, even limp. Mr. Dwight was not aggressive towards the officers and he did not threaten the officers in any way. While he was verbally combative and argued with the officers, Mr. Dwight was not loud and his voice was generally tempered. He did not use "fighting words" or "abusing" language. And, there is no evidence that Mr. Dwight resisted arrest; in fact, he told the officers at times that that he was not resisting arrest because he understood he was not being arrested.

In addition, while Mr. Dwight declined to give Officer Dye his name before the attempted pat down search, Officer Dye did not have a legal basis to compel Mr. Dwight to provide his identification and could not arrest Mr. Dwight merely for refusing to give his name. In *Brown v. Texas*, 443 U.S. 47, 52–53 (1979), the Supreme Court held that police officers, lacking reasonable suspicion of criminal conduct, could not demand identification and then arrest

35

the person for failing to provide it. In accordance with *Brown*, police officers must have

"reasonable suspicion to believe the [person detained for identification and arrested for failing to

comply] *was engaged or had engaged in criminal conduct*." *Romero v. Schum*, 413 F. App'x 61,

64, 66 (10th Cir. Feb. 15, 2011) (emphasis in original). Moreover, following *Brown*, the Tenth

Crcuit held that to arrest someone for concealing one's identity in violation of NMSA § 30-22-

3,[21] there must be reasonable suspicion of some predicate underlying crime. *Keylon*, 535 F.3d at

1216 (*citing Brown,* 443 U.S. at 53). Officer Dye offers no compelling explanation why he could

arrest Mr. Dwight for failing to provide his name in the absence of reasonable suspicion of some

predicate underlying crime at the time Mr. Dwight declined to give his name.[22] Therefore, not

only has Officer Dye failed to present evidence of probable cause for the arrest, he has not

offered evidence of reasonable suspicion of a predicate underlying crime. Accordingly, the Court

concludes that Officer Dye's arrest of Mr. Dwight was unconstitutional. *See Romero*, 413 F.

App'x at 68.

### 1. *Officer Dye's Motion for Qualified Immunity*

Having found that Officer Dye's conduct violated Mr. Dwight's constitutional right, the

Court next determines whether the right was clearly established, i.e., whether it would be clear to

a reasonable officer that his conduct was unlawful under the circumstances presented. In

analyzing this prong of the qualified immunity inquiry, the Tenth Circuit Court, in *Buck*, 549

F.3d at 1286–87, observed, "In the context of an unlawful arrest our analysis is simple, for the

law was and is unambiguous: a government official must have probable cause to arrest an

individual." (citation omitted). However, the Tenth Circuit Court has also instructed that courts

should not define clearly established law at a high level of generality; instead, "the dispositive

---

[21] This state statute is similar to the concealing identity City Ordinance on which Officer Dye relies.

[22] The Court understands that Officer Dye had hoped to avoid these cases by arguing they are inapposite since they
do not pertain to the pertinent City Ordinances, but the Court is not persuaded that these cases are inapposite.

question is 'whether the violative nature of *particular* conduct is clearly established.'" *Holmes*, 2016 WL 3999756, at *6 (emphasis in original). Stated differently, the Court's conclusion that Mr. Dwight has presented sufficient evidence to show a violation of a constitutional right does not automatically mean that qualified immunity must be denied to Officer Dye.

With respect to the pertinent specific circumstances, it was clearly established that an individual's evasiveness does not create probable cause to arrest for obstruction. *Keylon*, 535 F.3d at 1216–17. In addition, it was clearly established that without some type of physical resistance to the investigation and specific speech, more akin to "fighting words," an officer would not have probable cause to believe a suspect had violated the state statute that is very similar in wording to the City Ordinance on which Officer Dye relies. *Id.* at 1217. Finally, it was clearly established that an arrest for concealing one's identity required reasonable suspicion of some predicate, underlying crime, evidence of which was not presented. *See* at 1216.

The Court recognizes that police officers perform duties in the heat of the moment with considerable uncertainty as to whether a particular search or seizure is lawful and that they make reasonable mistakes at times. However, in light of the specific context of this case, the Court determines that a reasonable officer would have known that an arrest of Mr. Dwight, based on little more than his evasive answers to some questions, his failure to provide his name, and his verbal objections to the officers' actions, without evidence of "fighting words" and physical resistance to the investigation, would be unlawful. Therefore, the Court finds that Officer Dye is not entitled to qualified immunity on Mr. Dwight's unlawful arrest claim and will deny Officer Dye's motion for qualified immunity as to that claim (Count XI).

### 2. *Mr. Dwight's Motion for Summary Judgment*

The Court recognizes that an officer's reasonable mistake can justify a probable cause determination. *Nicholson*, 721 F.3d 1238. However, based on a totality of the circumstances, the Court concludes that Officer Dye could not have objectively and reasonably believed that he had probable cause to arrest Mr. Dwight for resisting or obstructing the officers' investigation or for concealing his identity. Stated differently, no reasonable officer could find Mr. Dwight's conduct violative of the ordinances or that Mr. Dwight's conduct provided probable cause to effect an arrest. *See Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir. 2007). Because the Court concludes Officer Dye did not have probable cause to arrest Mr. Dwight, the Court will grant Mr. Dwight's motion for summary judgment on the unlawful arrest claim (Count XI), although a jury will determine the question of damages.

IT IS THEREFORE ORDERED that:

(1) PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS VI, VII, VIII, IX, AND XI (Doc. No. 42) is GRANTED in part and DENIED in part, with the results that:

    a.  Plaintiff Miesch is entitled to summary judgment on her unlawful seizure claim against Officer Dye (Count VII);

    b.  Plaintiff Dwight is entitled to summary judgment on his unlawful pat down search claim against Officer Dye and Officer Brionez (Count IX);

    c.  Plaintiff Dwight is entitled to summary judgment on his unlawful arrest claim against Officer Dye (Count XI); and

    d.  Plaintiff Dwight is not entitled to summary judgment on his unlawful seizure claim against Officer Dye (Count VI), which will be dismissed with prejudice,

based on the Court's determination that Officer Dye is entitled to qualified immunity.

(2) DEFENDANTS DYE, BRIONEZ AND FINCHER'S MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY (Doc. No. 37) is GRANTED in part and DENIED in part, with the results that:

    a.  Defendant Dye is entitled to qualified immunity on Mr. Dwight's unlawful seizure claim against Defendant Dye (Count VI), which will be dismissed with prejudice; and

    b.  Defendants are not entitled to qualified immunity on Ms. Miesch's unlawful seizure claim (Count VII), on Mr. Dwight's unlawful pat down search claim (Count IX), and on Mr. Dwight's unlawful arrest claim (XI), which all will proceed for a jury determination on the question of damages.

(3) Based on representations in Plaintiffs' Response (Doc. No. 44) and of Plaintiffs' counsel at the August 23, 2016 motion hearing, Plaintiffs have voluntarily withdrawn the following claims which will be dismissed with prejudice:

    a.  Plaintiff Dwight's unlawful seizure claim against Officer Brionez (Count VI);

    b.  Plaintiff Miesch's "unreasonable search seizure" claim against Officer Brionez (Count VII);

    c.  Plaintiff Dwight's "unreasonable seizure for unlawful orders" claim against Officer Dye and Officer Brionez (Count VIII);

    d.  Plaintiff Dwight's and Plaintiff Miesch's excessive force claims against Officer Dye and Officer Brionez (Count X);

e.   Plaintiff Dwight's unlawful arrest claim against Officer Brionez and Officer Fincher (Count XI);

f.   Plaintiff Dwight's malicious prosecution claim against Officer Dye, Officer Brionez, and Officer Fincher (Count XII);

g.   Plaintiff Dwight's "due process and seizure" claim against Officer Dye and Officer Brionez (Count XIII); and

h.   Plaintiff Dwight's and Plaintiff Miesch's First Amendment retaliation claim against Officer Dye, Officer Brionez, and Officer Fincher (Count XIV).

_____

SENIOR UNITED STATES DISTRICT JUDGE